UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| William Eugene Webb, #19695-057, | ) C/A No. 0:05-2546-HHF-BM |
| | ) |
| Plaintiff; | ) |
| | ) |
| vs. | ) **REPORT AND** |
| | ) **RECOMMENDATION** |
| Matthew B. Hamidullah, Warden; | ) |
| Z.R. Vendel, MD, Medical Director; | ) |
| Steve Labeir, Unit Manager; | ) |
| Charles Grubbs, Unit Counselor, | ) |
| | ) |
| Defendants. | ) |

This action has been filed by the Plaintiff, pro se, pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. Plaintiff, an inmate with the Federal Bureau of Prisons (BOP), alleges violations of his constitutional rights as well as violations of the FTCA.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on February 3, 2006. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on February 6, 2006, advising Plaintiff of the importance of a motion for summary judgment and of the necessity for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. Plaintiff thereafter filed a memorandum in opposition to the Defendants' motion, with attached exhibits, on March 13, 2006.



By order filed April 21, 2006, Defendants were ordered to provide additional evidence to the Court. Defendants filed this material with the Court on May 8, 2006, following which Plaintiff filed a reply affidavit on May 18, 2006. Defendants' motion is now before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his first amended Complaint[2] that the named Defendants have been deliberately indifferent to his serious medical needs, including compelling him to perform labor beyond his physical capacity. Plaintiff also complains generally that the Defendants violated his rights to "due process" and "equal protection" when they engaged in "retaliatory actions". With respect to his medical claims, Plaintiff alleges that the Defendants were deliberately indifferent to his serious foot deformity, and that they engaged in cruel and unusual punishment "when they refused and failed to seek other outside medical treatment for Plaintiff's serious left-fore-arm condition, when the contracted physician refused to treat Plaintiff's injury because the Plaintiff smoked tobacco."

As part of the "background facts" section of his Complaint, Plaintiff alleges that

---

[1] This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2] In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). However, even though Plaintiff's original Complaint was verified, he is now proceeding on an *unverified* amended Complaint. Therefore, the undersigned has not considered the factual allegations set forth in that unverified Complaint as evidence in issuing a recommendation in this case. The attached exhibits to the Complaint have been considered.

2



following a federal conviction on or about December 2000, and while he was awaiting designation to a federal housing facility, he became extremely ill and was hospitalized for an abdominal hernia complication and kidney failure, for which he had surgery on May 10, 2001. Plaintiff alleges that following his surgery, he was transferred to the U.S. Medical Center for federal prisoners in Springfield, Missouri. Plaintiff alleges that, while at this facility, he was seen by Dr. Hugh Harris on or about August 13, 2001, who determined that he was in need of two corrective surgeries, to repair his deformed left forearm, which was broken, and his left wrist, which was dislocated. Plaintiff complains that since this determination he has not received "community standard" medical care for his deformed forearm, or for an abdominal hernia which was diagnosed on or about September 25, 2003.

Plaintiff alleges that he was transferred to the Federal Correctional Institution in Estill, South Carolina on or about June 16, 2004, at which time he "promptly informed the medical personnel of his serious medical conditions, and the medically documented need of surgeries." Plaintiff further alleges that, after being informed that his conditions would receive little, if any, priority, he filed a formal Federal Tort Claim on or about June 30, 2004. Plaintiff has also attached numerous exhibits to his Complaint, which he discusses under the "relevant facts" portion of his Complaint.

One of these exhibits is a "sick call sign-up sheet" dated June 21 (or 29), 2004, in which he requests follow-up medical care and treatment for several purported health problems. Amended Complaint, Exhibit (A)(1). Plaintiff also alleges that on or about July 21, 2004, he requested and received "convalescent" medical classification status for a seven day period. This classification required that he be re-evaluated every seven days for an extension of his convalescent



status.  Amended Complaint, Exhibit (A)(10).  Plaintiff alleges that on or about July 26, 2004, he again filed a "sick-call slip" seeking treatment for his medical conditions.  See Amended Complaint, Exhibit (A)(11).  Plaintiff alleges that he was seen by a contract physician on or about July 30, 2004, who recommended that he receive surgery on his hernia.  See Amended Complaint, Exhibit (A)(12). Plaintiff alleges that he was also seen by Dr. John George on or about July 30, 2004, who determined that Plaintiff required a fibular bone graft. See Amended Complaint, Exhibits (A)(14). However, Plaintiff alleges that he was told by Dr. George that he would have to quit smoking for six months and have a urine test before this procedure could be performed.  See Amended Complaint, Exhibit (A)(15).

Plaintiff alleges that on or about September 3, 2004, he requested and received another convalescent classification status; Amended Complaint, Exhibits (A)(16); (A)(17); but that on or about September 7, 2004 Plaintiff's medical classification was changed by a "S. Barron, MLP" to "restricted duty" work status, with "no lifting over 10 pounds, and no prolonged standing".  See Amended Complaint, Exhibit (A)(18).  Plaintiff alleges that he thereafter made an informal complaint regarding his removal from the idle classification to the Defendant Dr. Vendel, Clinical Director of the FCI Estill Medical Department.

Plaintiff also alleges that on or about September 10, 2004, he was seen by a podiatrist, who determined that he should have special orthopaedic footwear.  See Amended Complaint, Exhibit (A)(20).  Plaintiff further alleges that on or about September 18, 2004, he submitted a sick call slip to medical because he was experiencing pain and discomfort due, Plaintiff alleges, to his assigned work duties as a housing unit orderly; Amended Complaint, Exhibit (A)(21); (A)(22); and that he submitted a second sick call slip to medical on September 20, 2004. See



Amended Complaint, Exhibit (A)(23). Plaintiff alleges that he was thereafter seen by Dr. Vendel on or about September 24, 2004, and was told that additional surgeries for his complaints had not been approved. See Amended Complaint, Exhibits (A)(23). However, Plaintiff alleges that following his continued complaints, Dr. Vendel did approve him for surgery on or about November 22, 2004. See Amended Complaint, Exhibits (A)(30).

Plaintiff also continued to complain about pain as a result of his job assignment; Amended Complaint, Exhibit (A)(31); and on or about April 28, 2005, he was assigned an updated restricted duty work status pass from the medical department. Plaintiff alleges that he was informed, however, that this pass would not be considered an excuse to reduce his job assignment performance. See Amended Complaint, Exhibit (A)(32); (A)(33).[3]

Plaintiff alleges that on or about May 13, 2005, he was taken to a hospital for high blood pressure and observation. Plaintiff thereafter filed sick call slips with FCI Medical on or about July 5, 2005 complaining about the physical strain of his assigned work duties, while his mother also contacted prison officials about his medical condition and care. Amended Complaint, Exhibit (B)(5). Plaintiff also alleges that he also filed a formal administrative remedy complaint on or about June 23, 2005 regarding the pain he was having to endure as a result of his work assignment. See Amended Complaint, Exhibit (B)(6).

Plaintiff alleges that on or about June 28, 2005, he was charged with, and found guilty of, failure to perform his assigned job duties; see Amended Complaint, Exhibit (B)(7); which Plaintiff alleges was retaliation for his exercising his legal rights. Plaintiff thereafter filed a complaint of retaliation and race discrimination on or about July 7, 2005. See Amended Complaint,

---

[3]Due to poor print quality, these two (2) exhibits are extremely hard to read.



Exhibit (B)(8). Plaintiff alleges he is continuing to be retaliated against, and seeks monetary damages and injunctive relief. See generally, Plaintiff's Amended Complaint with Attached Exhibits.

In support of summary judgment in the case the Defendants have submitted numerous exhibits setting forth the medical care Plaintiff has received since his assignment to the BOP. The Defendant Vendel has also submitted an affidavit wherein he attests that he is the Clinical Director at FCI Estill, and that his duties include ensuring that assigned inmates receive proper and adequate medical treatment. Vendel attests that from May 25, 2001 through January 15, 2003, and again from April 1, 2003 - January 28, 2004, Plaintiff was incarcerated at the United States Medical Center for Prisoners (USMCFP) in Springfield, Missouri for treatment of a ventral hernia and repair to his left forearm which had been injured by a gunshot. Vendel attests that Plaintiff underwent plating and bone grafting to repair his left forearm on August 19, 2002, which was followed up by further surgery and long term IV therapy due to an infection of the graft placed in his left forearm on May 12, 2003. Vendel attests that Plaintiff was transported by USMCFP staff to a local hospital on January 2, 2004 to have surgery performed on his ventral hernia, but that upon arriving at the hospital Plaintiff refused to have this surgery performed. Vendel attests that Plaintiff thereafter remained at the SUMCFP until January 28, 2004, at which time medical staff determined that he had fully healed from his left forearm surgery and could be housed in a mainline institution.

Vendel attests that Plaintiff arrived at FCI Estill on June 16, 2004, and that during a routine physical examination it was noted that he had had plating and bone grafting performed on his left forearm, that he had a ventral hernia, and that he claimed to have nerve damage to his right foot due to a previous gunshot wound. It was also noted during this examination that Plaintiff had

6



been provided with custom made soft shoes for his right foot and neuropathy. Plaintiff was provided with medications and consultations were initiated to the consultant general surgeon and orthopaedic surgeon for follow-up care for his medical conditions.

Vendel attests that on July 30, 2004, Plaintiff was examined by a consultant general surgeon concerning his ventral hernia, who noted that Plaintiff was status post for a previous gunshot wound to the abdomen for which a previous small bowel resection had been performed, and that Plaintiff had also had a previous ventral hernia repair performed in 2000. Plaintiff indicated to the general surgeon that his ventral hernia was not painful, he did not have any nausea or vomiting, no constipation, and no urinary obstructive symptoms. The general surgeon recommended that a laparoscopic repair of the ventral hernia be performed, which would require a three to four day hospital stay. Vendel attests that he subsequently consulted the general surgeon to ascertain whether or not ventral hernia repair surgery was medically necessary or was instead an elective procedure, at which time the general surgeon stated that this was an elective procedure (i.e., not medically necessary) and that Plaintiff's hernia was reducible and controlled with the use of a hernia belt. Vendel attests that he was further advised to routinely monitor Plaintiff's condition, and that if Plaintiff experienced any further problems or symptoms arose indicating his hernia was becoming strangulated, then surgery would be necessary.

Vendel attests that surgery is not the only treatment option for a hernia, and is not mandatory for reducible hernias (the type of hernia Plaintiff has) dependent on the size of the hernia. Vendel attest that many people live for years without complication with reducible hernias, electing not to have surgical correction, and that unless a hernia is non-reducible, surgical repair is considered elective surgery. Vendel further notes that there are always risk of complications with

7



any kind of surgery, and that the laparoscopic repair of a ventral hernia is not an easy procedure.

Vendel attests that on August 17, 2004 Plaintiff was examined by a consultant orthopaedic surgeon concerning his left forearm, who indicated that Plaintiff had had one previous reconstruction attempt that failed with an infection. This surgeon further stated that it appeared Plaintiff had a segmental defect of his left radius, and that what the segmental loss was would depend on whether or not Plaintiff needed to have a vascularized fibular graft or bone autograft. The surgeon further indicated that this type of operation had a high risk of being unsuccessful, and that before anyone in his office would attempt such surgery Plaintiff would have to quit smoking for six months and have a urine test. Vendel attests that, following this consultation, Plaintiff continually approached FCI Estill medical staff insisting that he be provided with left forearm surgery and that he knew such surgery did not require extensive stop smoking requirements. Vendel attests that it was explained to the Plaintiff that the vesicles in that part of his arm are impacted by smoking, and that quitting smoking would increase the chances of a successful surgery, but that Plaintiff continued to disagree and informed medical staff he would have the courts approve the procedure.

Vendel further attests that in April 2005, the BOP initiated a total ban on the use of tobacco products in its facilities, and that as a result of this new policy he initiated another consultation with the orthopaedic surgeon on August 3, 2005 to determine if surgery could now be performed on the Plaintiff since smoking should no longer be a factor. Vendel attests that Plaintiff also continues to receive routine follow-up care for his ventral hernia and his left forearm, and that his ventral hernia is still reducible and controlled with the use of a hernia belt.

Vendel also attests that Plaintiff has not made any complaints to FCI Estill medical staff concerning his right foot neuropathy. Vendel attests that Plaintiff was examined by a

8



consultant podiatrist on September 10, 2005, who indicated Plaintiff has peripheral neuropathy and hammertoe in his right foot, and recommended that Plaintiff be provided with a new pair of custom soft shoes because the shoes Plaintiff had been utilizing appeared to have a break in the sole. Vendel attests that, in addition to these conditions, Plaintiff also has a medical history of gout, alcohol abuse, drug abuse, high blood pressure, chronic renal failure, tobacco abuse, chronic hepitis C, and gastropesophageal reflux disease, and that due to this medical history Plaintiff is considered a high risk patient. Vendel attests that all of these diagnoses have been taken into consideration when developing a treatment plan for the Plaintiff, and that Plaintiff continues to receive medical evaluations with alternatives for care and necessary accommodations. Vendel attests, however, that Plaintiff consistently fails to comply with the recommendations given to him, fails to comply with the reciprocal responsibility to comply with medical treatments rendered and to apply life style changes, that Plaintiff continuously disagrees with the recommendations of consultant specialists and institution medical staff regarding his medical care, and that Plaintiff is argumentative and attempts to intimidate medical staff into giving him what he wants when he wants by constantly threatening legal action.

Finally, Vendel attests that Plaintiff has been provided with the medical restrictions of no prolonged standing and no lifting over ten pounds, that he is physically capable of performing work assignments that are commensurate with these medical restrictions, and that there is no medical reason for Plaintiff to be placed on an indefinite convalescent status or be permitted to be exempt from a working assignment. See generally, Vendel Affidavit.

The Defendant Steven Labeir has also provided an affidavit wherein he attests that he is a unit manager at FCI Estill, where he is responsible for the oversight of the orderly and safe

9



running of an inmate housing unit.  Labeir attests that he is familiar with the Plaintiff, and that since Plaintiff's arrival at FCI Estill on June 16, 2004 he has been a disruptive and argumentative inmate who constantly threatens staff members that he will sue them if he does not get what he wants when he wants it. Plaintiff also contends that he suffers from medical problems that prohibit him from having to do any work.  Labeir attests that, upon Plaintiff's arrival at FCI Estill, he was assigned to work as a yard orderly, a job which required him to routinely walk around the institution compound and pick up or sweep trash and occasionally mow and trim grass and sweep sidewalks.  Labeir attests that this work assignment lasted only eight days because Plaintiff was provided with medical restrictions of no prolonged standing and no lifting over ten pounds because of his medical conditions.  Labeir attests that Plaintiff was then assigned to work as a unit orderly, where he is only required to wipe down walls and handrails.  Labeir further attests that, keeping in mind Plaintiff's medical conditions and restrictions, he is not required to exert himself while performing this detail and is permitted to sit or lie down when he feels the need.  However, Labeir attests that Plaintiff still consistently refuses to work.  Labeir also attests that he and his staff routinely consult with the medical department to ensure that the Plaintiff has not been given any additional restrictions that would prohibit him from performing any type of work assignment.

Labeir attests that Plaintiff has received four incident reports while at FCI Estill, and that he has been found to have committed the prohibited acts of failing to work as instructed, refusing to obey an order, and twice has been sanctioned for being unsanitary or untidy.  Labeir attests that Plaintiff has been sanctioned for failing to work because he believes he should not be required to work at all, and that he has received incident reports for refusing an order and being unsanitary or untidy because he refuses to keep his living quarters clean and sanitary.  Labeir also



attests that he has never denied Plaintiff access to the BOP internal grievance procedure, and that, in fact, since Plaintiff's arrival at FCI Estill, he has filed thirty-four (34) grievances under the BOP's administrative remedy program as well as several documents with the federal courts.

Finally, with respect to Plaintiff's medical care, Labeir attests that he does not provide personal medical care for inmates, and that all decisions regarding Plaintiff's medical care are made by the FCI Estill Clinical Director and his medical staff. Labeir further attests that, to his knowledge, Plaintiff has never been diagnosed with a condition that would totally exempt him from being placed in an inmate job assignment. See generally, Labeir Affidavit.

The Defendant Charles Grubbs has also submitted an affidavit wherein he attests that he is a counselor at FCI Estill, and that his responsibilities include assisting inmates with completion of their programming needs and assisting with the orderly and safe operation of the housing unit. Grubbs attests that he is familiar with the Plaintiff, who alleges that he suffers from medical problems that prohibit him from being assigned to a work detail, and who consistently threatens that he will sue Grubbs if he does not get what he wants. Grubbs attests to the same work history and incident report history for the Plaintiff as has been attested to by Labeir in his affidavit. Grubbs also attests that he has never denied Plaintiff access to the BOP internal grievance procedure, and reiterates Labeir's statements in his affidavit with respect to the number of grievances Plaintiff has filed. Grubbs further attests that he has no responsibility for providing medical care to the Plaintiff, but that to his knowledge Plaintiff has never been diagnosed with a condition that would totally exempt him from being placed in an inmate job assignment.

Finally, Grubbs attests that he has never threatened the Plaintiff, nor has he taken any actions that could be construed as retaliation against the Plaintiff. Grubbs attests that he has

11



continuously attempted to resolve matters with the Plaintiff in an amicable manner, but that Plaintiff does not provide the same courtesy and simply tells Grubbs that he will have the court settle his claims. See generally, Grubbs Affidavit.

The Defendant Hamidullah has provided an affidavit wherein he attests that he is the Warden at FCI Estill. Hamidullah attests that, as Warden, he does not provide personal medical care for any inmate, that he has had no personal involvement in the medical decisions that have been made regarding Plaintiff's medical care, and that all medical decisions are made by the Clinical Director and his medical staff. Hamidullah attests that on July 20, 2005 he provided a response to a request for administrative remedy in which Plaintiff asserted that he was not receiving appropriate medical care, and that in this response he informed Plaintiff that a review of his medical file indicated he was receiving appropriate medical care and had been provided with medical restrictions commensurate with his medical conditions. Hamidullah further attests that inmate job assignments are assigned by the Plaintiff's unit team staff and are dictated by the needs of the institution, that he [Hamidullah] is not aware of Plaintiff's job assignment or whether or not he has any medical restrictions that prohibit certain types of job assignments, and that he does not recall Plaintiff ever personally informing him of any problems with his inmate job assignments. See generally, Hamidullah Affidavit.

As an attachment to his memorandum in opposition to the Defendants' motion for summary judgment, Plaintiff has provided an affidavit in which he repeats many of the allegations of his Complaint, denies he has ever refused surgery, and argues that when the podiatrist prescribed him orthopaedic shoes, Vendel should have ensured that he received them. Plaintiff also cites to one of his medical records, attached to his affidavit as Exhibit A, p. 00009, to argue that, while the



surgeon agreed with Vendel that surgery was not urgent and could be done electively, it was supposed to have been done within the time frame of six months.  See Attached Exhibit.  Plaintiff also attests that he was never provided with a hernia belt, but was instead provided with a back brace by the health service administrator, who stated his intention of ordering him a hernia binder, which after six months he had still not received.  Plaintiff attests that he has stopped smoking, but that he has not received a urine test or any presurgery examinations by an orthopaedic doctor, even though Vendel knows that he does not smoke.  Plaintiff also asserts that the job he is required to perform is not commensurate with his medical restrictions, and that his chronic medical conditions cause him considerable pain and daily discomfort.

Plaintiff further denies that he has ever been disruptive or disrespectful, and that both Grubbs and Labeir have "unequivocally informed me that they both have a strong dislike of black men, and especially those that question their actions, in any manner."  Plaintiff also disputes that, as a unit orderly, he is only required to wipe down walls and handrails.  Plaintiff attests that he has often been ordered to sweep and mop floors, scrub shoe scuff marks from walls of the entire housing unit, strip and wax floors, paint walls, and other physical work assignments.  Plaintiff also states that, since the filing of this civil action, he has "been totally denied administrative remedy grievance due process", and that over five of his filed grievances have not been responded to in over two months. See generally, Plaintiff's Affidavit, with attached Exhibits.

Plaintiff has also submitted an affidavit from fellow inmate Dominique Green (Plaintiff's Exhibit H), who attests that from March 2005 through July 2005 he was Plaintiff's cellmate at FCI Estill.  In his affidavit, Green contests the validity of incident reports served on he and the Plaintiff on May 13, 2005 charging them with failure to follow safety or sanitation

13



regulations and with being unsanitary or untidy. See generally, Green Affidavit. See also Plaintiff's Exhibit (B)(3). Another affidavit has been provided from fellow inmate Davin Lamont Smith (Plaintiff's Exhibit I), wherein he attests that on or about September 21, 2005 he and the Plaintiff were written incident reports for being untidy, failing to keep quarters in accordance with posted standards, and unexcused absence from work. Smith attests that these incident reports were written after he and the Plaintiff had been cellmates for about a month, that he had taken full responsibility for keeping the cell clean, and that Plaintiff should not have been convicted of this charge. See generally, Smith Affidavit.

In response to the Court's order of April 21, 2006, Vendel submitted a supplemental affidavit (Court Document #27) responding to several specific issues raised by the Plaintiff in his filings. First, with respect to Plaintiff's assertion in his affidavit (submitted with his memorandum opposing summary judgment) that he has quit smoking, and in fact quit smoking prior to the implementation of the BOP's tobacco ban in April 2005, but that he has still never had a urine test and never been scheduled for surgery, Vendel attests in his supplemental affidavit that Plaintiff was in fact seen by a consultant orthopaedic surgeon for his left arm condition on March 1, 2006 (prior to the date of Plaintiff's affidavit); see also Vendel Supplemental Affidavit, Attachment 1 [Office Visit Notes]; following which the consultant orthopaedic surgeon indicated he could not promise that surgery would work and also indicated that, in addition to failure of the procedure, the risks from surgery included infection, bleeding, wound complications, nerve and vessel injury, and the possible need for additional procedures. Vendel attests that after he reviewed the orthopaedic surgeon's examination notes, he [Vendel] did not recommend approving the surgery and recommended continuing treatment of Plaintiff's left arm with conservative therapy. See also,

14



<u>Vendel Supplemental Affidavit, Attachment 2</u>.  Vendel further attests that the matter has been referred to the Institution's Utilization Review Committee for consideration, and that if the Committee does not agree with his recommendation to disapprove the surgery, Plaintiff will be scheduled for surgery at the direction of the orthopaedic surgeon, but that in any event treating Plaintiff's condition conservatively instead of with surgery in no way places Plaintiff in any kind of danger or risk of harm.

With respect to Plaintiff's statement in his affidavit that he has never been provided new shoes notwithstanding the consultant podiatrist's recommendation of September 10, 2005 that he receive a new pair of custom soft shoes because the shoes Plaintiff had been utilizing appeared to have a break in the sole, Vendel attests that the podiatrist clearly indicated to the Plaintiff following his September 10, 2005 examination that he [Plaintiff] was to check with the Health Services Administrator regarding orthopaedic shoes, and that there is nothing in the medical record after September 10, 2005 to show that Plaintiff ever spoke with the Health Services Administrator about orthopaedic shoes.  Vendel further attests that, although it is clearly documented that Plaintiff has a foot deformity due to sustaining a gunshot wound, he has not reported during sick call or chronic care clinic appointments any problems with his foot for approximately one year, and that he [Vendel] believes Plaintiff is fully capable of ambulating in regular footwear without difficulty, and no longer needs the continued use of custom orthopaedic shoes.

Finally, with respect to Plaintiff's statement in his affidavit that he has never been provided with a hernia belt and has instead only been provided with a back brace, which is of no use in dealing with his hernia condition, Vendel attests in his supplemental affidavit that Plaintiff was issued a hernia belt by the Health Services Administrator on August 10, 2005.  <u>See</u> <u>also</u> <u>Vendel</u>

15



Supplemental Affidavit, Attachment 3 [Hernia Belt Issuance Certificate date August 10, 2005]. Vendel further attests that on March 2, 2006, a new hernia belt was ordered and Plaintiff was instructed that once it arrived it would be issued.  See also, Vendel Supplemental Affidavit, Attachment 4.  Vendel attests that Plaintiff was also examined by the consultant general surgeon regarding the status of his ventral hernia on March 10, 2006, and that the general surgeon has recommended operative repair via laparoscopic surgery. See also, Vendel Supplemental Affidavit, Attachment 5.  Vendel attests that even though Plaintiff has refused surgery for his ventral hernia on two previous occasions, he reviewed the consultation notes provided by the general surgeon on April 27, 2006, and that even though this surgery is an elective procedure, he has submitted the general surgeon's recommendation to the Utilization Review Committee.  Vendel attests that if the Committee approves the procedure, it will be scheduled.  See also, Vendel Supplemental Affidavit, Attachment 6.

        In response to this evidence, Plaintiff attests in his supplemental affidavit that Vendel has continued to deny him surgery, even though he "constantly complained of pain and discomfort...."   Plaintiff also attests that Vendel refuses to provide him with new replacement orthopaedic shoes, even though a podiatrist has recommended that he be provided with new shoes. Plaintiff also attests that he never received a replacement hernia belt, but was only given a back brace, and complains about Vendel refusing to schedule him for hernia surgery.  Plaintiff does concede that he was seen by a surgeon on March 28, 2006, as attested to by Dr. Vendel in his affidavit, but complains about having been shackled during the ride to the surgeon's office, stating that the restraints caused him great pain due to his wrist and arm problems.  Plaintiff states that this resulted in his arm being "swollen considerably."  Finally, Plaintiff attests that he has never refused



surgery, and that Attachment 6 to Vendel's Supplemental Affidavit is a "fabrication". <u>See</u> <u>generally,</u> <u>Plaintiff's Supplemental Affidavit</u>.

### <u>Discussion</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a <u>pro</u> <u>se</u> litigant to allow the development of a potentially meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

### I.

### (<u>Bivens</u> Claim)

Since Plaintiff is a federal prisoner, his constitutional claims are evaluated under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, <u>supra</u>, which established a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights. <u>Bivens</u>, 403 U.S. at 397. A <u>Bivens</u> claim is analogous to



a claim brought against state officials under 42 U.S.C. § 1983; therefore, caselaw involving § 1983 claims is applicable in <u>Bivens</u> actions, and vice versa. <u>See</u> <u>Farmer v. Brennen</u>, 511 U.S. 825 (1994); <u>Bolin v. Story</u>, 225 F.3d 1234, 1241-1242 (11th Cir. 2000); <u>Campbell v. Civil Air Patrol</u>, 131 F.Supp.2d 1303, 1310, n. 8 (M.D.Ala. 2001).

   1) <u>Medical Claim</u>. With respect to Plaintiff's medical claim, in order to survive summary judgment and proceed with this constitutional claim in this Court, Plaintiff must present evidence sufficient to create a material issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Farmer</u>, 511 U.S. at 837; <u>Sosebee v. Murphy</u>, 797 F.2d 179 (4th Cir. 1986); <u>Wester v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975); <u>Belcher v. Oliver</u>, 898 F.2d 32, 34 (1990). However, a careful review of the affidavits and other exhibits presented to this Court shows that, whatever Plaintiff may think about the level of care he is receiving, he has failed to submit evidence sufficient to show that his *constitutional rights* are being violated.

   Indeed, Plaintiff's medical file is actually quite extensive, and although he is correct that he has received recommendations for surgical care, Defendants note that there is no indication in the medical evidence that these recommendations were based on any surgical necessity. Rather, the surgery discussed was elective. While Plaintiff makes general and conclusory claims as a lay person that he should have the surgery he is requesting, he has provided no medical evidence to support his claim that any surgery is medically required at this time, and the Court is not required to simply accept as true general or conclusory claims and allegations absent any factual or evidentiary support. See <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)[Courts need not assume the truth of legal conclusions couched as factual allegations.]; <u>Bender v. Suburban Hospital, Inc.</u>, 159



F.3d 186 (4th Cir. 1998); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].      .

Conversely, Dr. Vendel, a physician, attests in his affidavit and supplemental affidavit that Plaintiff's ventral hernia remains reducible and controlled, and that continuing to treat both Plaintiff's hernia and left arm condition conservatively instead of with surgery in no way places Plaintiff in any kind of harm.  For purposes of a constitutional claim, whether or not Plaintiff was provided with the care he desires or has requested is immaterial. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988) [the Constitution "does not guarantee to a prisoner the treatment of his choice."]; see also Brown v. Thompson, 868 F.Supp. 326, 329-330, n. 2 (S.D.Ga. 1994); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) [A physician's actions only rise to the level of deliberate indifference when the treatment provided is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."]; Casey v. Lewis, 834 F.Supp. 1569, 1583 (D.Ariz. Apr. 5, 1993).

Further, the medical records provided to the Court, in addition to detailing the frequent and ongoing medical care and evaluations received by the Plaintiff, also directly contradict many of the statements Plaintiff makes in his affidavit.  For example, Plaintiff states that the general surgeon indicated his hernia surgery needed to be done within a six month time frame.  However, the cited entry from Dr. Vendel actually reads: "I have discussed this case [with] the [general] surgeon.  We agreed that the surgery is not urgent, can be done electively within a time frame of 6 mos.".  See Amended Complaint, Exhibit (A)(9).  This statement does not constitute a *requirement* that any surgery be done within six months, as Plaintiff would have this Court believe, nor has



Plaintiff offered any evidence to show that this was required surgery during the relevant time period.

Plaintiff's complaint that he was *never* provided with a hernia belt is also contradicted by the medical records. <u>Vendel Supplemental Affidavit, Attachment 3</u>; <u>see</u> <u>Morgan</u>, 829 F.2d at 12 [court not required to accept as true unwarranted factual inferences]. While obtaining a belt for the Plaintiff may have taken some time, even assuming there was a delay in Plaintiff's receipt of a hernia belt, the fact remains that the medical evidence before the Court shows that Plaintiff's hernia remains reducible, with no evidence having been presented that Plaintiff has suffered any injury as a result of a delay in receiving a hernia belt. *Cf.* <u>Casey</u>, 834 F.Supp. at 1583 ["[A] mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference."].

Plaintiff also takes issue in his supplemental affidavit with the Defendant's contention that he has refused surgery on several occasions, stating that he has never refused surgery. Plaintiff also accuses Dr. Vendel of falsely stating that he had refused surgery in January 2004, noting that he was not even at FCI-Edgefield in January 2004.   However, Plaintiff's medical records again directly contradict his statements.  While it is true Plaintiff was not at FCI-Edgefield in January 2004, his medical records show that he was evaluated at FCI-Springfield on January 5, 2004, with the medical record showing that "[Plaintiff] was scheduled downtown for repair, but the patient refused surgery and [was] transferred back to the institution." <u>See</u> <u>Defendants' Exhibit 3 [Transfer Summary dated January 5, 2004]</u>.

As for Plaintiff's complaints about his shoes, while his medical record does show that a podiatrist has recommended that he receive new shoes because his old shoes had worn out, Dr. Vendel attests in his affidavit that Plaintiff has not reported any problems with his foot during sick

20



call or chronic care clinic appointments for approximately one year, and that he does not believe Plaintiff needs the continued use of custom orthopaedic shoes and is fully capable of ambulating in regular footwear without difficulty. The fact that two physicians may dispute the necessity for Plaintiff to wear orthopaedic shoes does not amount to evidence that Plaintiff's *constitutional rights* are being violated, or that any Defendant has shown a deliberate indifference to Plaintiff's serious medical needs. White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) ["If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor."]; *cf.* Buckner v. Warden, No. 92-6228, 1993 WL 62065 at **2 (4th Cir. Mar. 9, 1993) ["Regardless of whether there might be another doctor who might agree with [plaintiff] on this point, this is not a record on which a claim for deliberate indifference by the state officials is shown to any degree"], cert. denied, 510 U.S. 842 (1993).

In sum, even if the Court were to find that the evidence presented was sufficient to create a genuine issue of fact as to whether Dr. Vendel or any other named Defendant acted inappropriately or without sufficient care in dealing with Plaintiff's medical complaints, for the reasons stated such conduct would not be sufficient to maintain a Bivens claim for deliberate indifference to a serious medical need. Rather, Plaintiff would have to pursue these claims in tort under the Federal Tort Claims Act. *Cf.* Estelle, 429 U.S. at 106 ["medial malpractice does not become a constitutional violation merely because the victim is a prisoner."]. See Section II, infra. Therefore, as there is no evidence before the Court to show that during the relevant time period the Defendants were deliberately indifferent to any serious medical condition from which the Plaintiff was suffering as that term is defined in the applicable caselaw, this claim should be dismissed.

21



Estelle, 429 U.S. at 105; Harris v. Thigpen, 941 F.2d 1495, 1505-1507 (11th Cir. 1991); see Levy

v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A

defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive

risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837.

    2) Retaliation Claim. With respect to Plaintiff's retaliation claim, Plaintiff generally

cites to the disciplinary infractions he was charged with and then argues they were only filed out of

retaliation for Plaintiff pursuing his claims.  However, Plaintiff has provided no *evidence* whatsoever

to support such a finding in this case.    Rather, he has provided only general and conclusory

allegations that the Defendants' actions constituted unlawful retaliation. This is not "evidence"

sufficient to survive summary judgment.  See Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996)

(per curiam) [speculative and conclusory allegations cannot support retaliation claim]; Wright v.

Vitall, No. 91-7539, 1991 WL 127597 at **1 (4th Cir. July 16, 1991) [Retaliation claim based on

mere conclusory statements cannot withstand defendants' summary judgment motion]; LaCroix v.

Williams, No. 97-0790, 2000 WL 1375737 at *4 (W.D.N.Y. Sept. 21, 2000) ["Plaintiff's conclusory

allegations aside, there is simply nothing in the record to support his version of the facts and

plaintiff's claim for retaliation fails"]; see Mt. Healthy City School District Board of Education v.

Doyle, 429 U.S. 274, 287 (1977) [in order to be actionable, an alleged retaliatory act must violate

some constitutional right of an inmate or constitute punishment for the exercise of a constitutional

right]; Woods v. Edwards, 51 F.3d 577, 580-581 (5th Cir. 1995) [summary judgment affirmed where

inmate offered no evidence other than his personal belief that the alleged retaliatory actions were

based on his exercise of his rights].

    Defendants correctly note that claims of retaliation are generally treated with

22



skepticism by the Courts, because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir. 1996), (citing <u>Adams v. Rice</u>, 40 F.3d 72, 74 (4th Cir. 1994)).  Here, Plaintiff complains about disciplinary action taken against him as a result of his own misconduct, and then generally ascribes retaliatory motives to explain these disciplinary charges. However, as noted, none of the exhibits provided to the Court, either by the Defendants *or* by the Plaintiff, constitute evidence to support Plaintiff's claim that he is being retaliated against.

The affidavit Plaintiff provided from Dominique Green simply reiterates Plaintiff's assertions that the charges for failure to follow safety or sanitation regulations and for being unsanitary or untidy were without merit. It is not evidence that any named Defendant engaged in any unlawful conduct.  Inmate David Smith's affidavit also does not help the Plaintiff. Smith attests that, after he and the Plaintiff (roommates) were charged with being untidy and failing to keep quarters in accordance with posted standards, he [Smith] had taken full responsibility for keeping the cell clean and that the Plaintiff should therefore not have been convicted of this charge.  However, while it may have been noble for Smith to take the total blame for the cell he shared with the Plaintiff being untidy, it nevertheless remains a fact that *both* inmates occupied that cell, and there is nothing in the evidence before the Court to show that a conviction of both cellmates on a charge that their cell was unsanitary constituted retaliation against the Plaintiff. Such general and conclusory claims of retaliatory animus are simply not sufficient to maintain a retaliation claim in a <u>Bivens</u> action. <u>See</u> <u>Harris v. Ostrout</u>, 65 F.3d 912, 916 (11th Cir. 1995)[case dismissed where Plaintiff produced nothing beyond his own conclusory allegations suggesting that prison official's actions were motivated by a retaliatory animus]; <u>Adams</u>, 40 F.3d at 74-75, <u>cert. denied</u>, 514 U.S. 1022 (1995); <u>Southmark Prime</u>



Plus, L.P. v. Falzone, 776 F.Supp. 888, 891 (D.Del. 1991); see Nasim v. Warden, Md. House of Correction, 42 F.3d 1472, 1475 (4th Cir. 1995), reh'g 64 F.3d 951 (4th Cir. 1995), cert. denied, 516 U.S. 1177 (1996); see also Papasan, 478 U.S. at 286 [courts need not assume the truth of legal conclusions couched as factual allegations]; Morgan, 829 F.2d at 12 ["even though pro se litigants are held to less stringent pleading standards then attorneys, the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]. Therefore, this claim is without merit and should be dismissed.

       3) Job Assignment. Plaintiff's claim concerning his job assignment is also without merit. To the extent Plaintiff is arguing that his job assignment is based on retaliation by the Defendants, he has failed to set forth sufficient evidence to proceed with that claim for the reasons already discussed, supra. Otherwise, Plaintiff has set forth no medical evidence to counter the evidence submitted by the Defendants to show that he is capable of performing prison jobs with the medical restrictions of no prolonged standing and no lifting over ten pounds, and that there is no medical reason for Plaintiff to be placed on an indefinite convalescent status or be permitted to be exempt from a working assignment. Plaintiff's own opinion that he should not have to work because he is not physically able, without any supporting medical or other evidence, is simply not evidence sufficient to survive summary judgment.[4] House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [plaintiff's conclusory allegations insufficient to maintain claim]. This claim should be dismissed.

---

[4]However, even though Plaintiff has been medically approved for work, Defendants are cautioned that Plaintiff cannot be required to perform work while on his job that is inconsistent with his medical restrictions. Cf. Jaladian v. Hughes, No. 04-1304, 2006 WL 1629114 (E.D.Cal. June 9, 2006).



## II.

### (Federal Tort Claim)

Plaintiff also asserts that he is presenting his claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by governmental employees acting within the scope of their employment.[5] Under this act a plaintiff may recover monetary awards from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope...of...employment." 28 U.S.C. § 1346(b). Whether any government employee was negligent is to be determined "in accordance with the law of the place where the act or omission occurred." Id

However, the FTCA waives the sovereign immunity of the United States only in certain situations, and in order to obtain relief under this Act, litigants must strictly comply with the FTCA's requirements. See 28 U.S.C. § 2675; Johnson v. Smithsonian Inst., 189 F.3d 180, 189 (2d Cir. 1999) ["In order to state a claim under the FTCA, the person attempting to assert it must comply with several strictly construed prerequisites."] United States v. Kubrick, 444 U.S. 111, 117-118 (1979). Among these requirements is that an administrative claim must first be filed with the appropriate federal agency before commencement of a civil action in a district court. See 28 U.S.C. § 2675; McNeil v. United States, 508 U.S. 106, 113 (1993) ["The FTCA bars claimants from bringing suit in federal court until they have exhausted their administative remedies."]. Defendants

_____

[5]Although the United States has not been named as a party Defendant, Defendants do not seek dismissal of Plaintiff's FTCA claim on that ground.



assert in their motion for summary judgment that Plaintiff has filed no federal tort claim dealing with the conditions of his confinement at FCI-Edgefield. While Defendants concede that Plaintiff has filed an administrative claim, a review of that filing shows that it relates to conditions of Plaintiff's confinement while he was confined at the Federal Correctional Institution in Springfield, Missouri, not at FCI Edgefield. See Defendants' Exhibit 10.

Plaintiff did not respond to this argument in his memorandum or affidavits opposing summary judgment, and has presented no evidence to show that he has exhausted his administrative remedies with respect to any tort claims at FCI-Edgefield. Hence, as there is no evidence before the Court to show that Plaintiff has filed an administrative claim concerning the allegations set forth in his amended Complaint, or to demonstrate that he has properly exhausted his administrative remedies prior to filing this lawsuit, his claims under the FTCA should be dismissed, without prejudice.

## Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed.** To the extent Plaintiff has asserted an FTCA claim, that claim should be **dismissed**, without prejudice.

The parties are referred to the Notice Page attached hereto.

_____

Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

June 23, 2006

26



## Notice of Right to File Objections to Magistrate Judge's Report and Recommendation
## &
## The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be delivered to a United States District Judge fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra,; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

27

